v. Hospira, Inc. v. Hospira, Inc. Good morning, Your Honors. Thomas Fletcher for the appellant, Genentech. The Board here committed two errors. It construed the patent erroneously, and even if Your Honors were to find that its construction were correct, its obviousness analysis was deficient. I'll start off with the claim construction error. The patented issue here concerns the use of an anti-cancer therapy vest. Okay, well let me just go into the claim construction here. I'm having a hard time, I mean, I guess I understand maybe it's a little confusing about what the Board said, because I think what the Board, the Board's construction that it adopted, if you put Hospira's construction, your construction, and the Board's construction, the Board's construction seems really right and very close. It diverges from your construction only because it uses more precise language offered by your expert. Your expert said a targeted investigation directed specifically. So they substituted your expert's language for the language you had in your construction. And I don't see any difference between to confirming the presence or absence of a GI perforation. So I understand the Board said we're rejecting both constructions, but I'm not seeing a lot of daylight for argument that there's some problem with the Board's construction. All right? So you can tell me why I'm wrong, but I'm missing something here. I think we're all missing something here, Your Honors, because the Board was explicit in rejecting Genentech's proposed construction. Okay, but, but, okay, that's true. But what do you say to the points that I just said? Is not the language in the Board specifically adopted from what, Dr. Morris was your guy, right? Correct, Your Honor. All right. He referred, explained specifically GI perforation to require a targeted event-specific evaluation. There's all this language in, even though the construction that you proposed itself talks about taking diagnostic steps, there's all this language in your documents that refer to a targeted investigation directed specifically. So while the Board may have rejected the precise bottom line construction you offered, it seems to me what they came up with was entirely consistent and parroted what you were arguing. And if I can attempt to illuminate the difference between those positions that I believe exists. The ordinary meaning of assessing for any condition is some sort of targeted investigation for that condition. That's what Dr. Morris explained in his declaration. Okay, a targeted investigation directed specifically to confirming whether there's a GERD. Any condition. That's what he's explaining. It's in Appendix 1572 and 1562. Yeah, but we're talking about the GI perforation here. And now we're talking about GI perforation. Okay, exactly what the Board said. And to do that, sorry. Go ahead, go ahead. And to do that, to find out whether a patient has a GI perforation requires diagnostic steps. That's what the targeted investigation is when it comes to a GI perforation. Because simply doing a physical exam, which consists of touching the belly. Well, what do you mean by diagnostic step? Just the CT scan? Well, that's the dispute, and we can agree or disagree on that. But if you're saying that the difference between this is he should be limited exclusively to the CT scan, so is that what the dispute is here? I think that's part of it, Your Honor. As we explained, any diagnostic steps would be encompassed within the meaning of this claim limitation. It can be a CT or an X-ray. Those are the two ways that our expert radiologist explained one would typically figure out whether there is an effect. Is there anything in the 115 patent that limits assessments to diagnostics like CT scans or X-rays? No, I think that just comes from the ordinary meaning of what it means to assess for this condition. This patent concerns the recognition as we progressed through the clinical development of this drug that there is a potentially dangerous but very rare side effect. And that in order to use this drug safely, it is prudent to assess patients for this very rare condition that people don't ordinarily assess patients for. So that's the nature of the invention that arises from the phase three clinical trial here. How radiologists and oncologists cooperate to do this assessment is known in the art. It didn't need to be explained in the written description because we weren't inventing new diagnostic means. We were using them in connection with the use of this drug. So when the board says that it's rejecting our construction, I think we have to understand that the board thinks its construction encompasses taking diagnostic steps or something else. And it's unclear what that something else is. The board's analysis at pages six and seven of the appendix is rather thin when it comes to explaining what its construction means. What difference does it make as long as whatever that investigation is, is directed specifically toward confirming the presence or absence of GI corporation? Well, I think this leads into the obviousness error, Your Honor. So if we proceed to appendix 20, the one page of obviousness analysis with which the board took down this patent, the thing that jumps out on a first reading of that single page is that the board's construction is nowhere to be found. If you go to appendix page 20 and read the entirety of the analysis, there's no discussion of this targeted investigation that the board just said its claim construction entails. Instead, the board starts off by saying we agree with appendix page 20. Okay, that's not, I misunderstood what you said. There's 10 pages that precedes that that talks about this analysis, this part and parcel of the analysis, right? So I would disagree with that, Your Honor. I think the 10 pages that precede it are the board's summary of what the parties had argued. I think this court has made... Okay, well, it's not worth us getting into debate over that semantics. So, okay, proceed. That's fine. Okay, so we see in page 20 in the board's analysis that this claim construction that it has adopted is nowhere applied. Instead, it says, we think the invention is obvious because we credit Dr. Nugget's testimony, who is a petitioner's expert, that the standard of care and knowledge of the person of ordinary skill would have guided a physician to assess patients, and that this would begin with evaluating symptoms like nausea or abdominal pain. And we've already seen that the patent scope doesn't encompass just assessing for symptoms. It actually requires some investigation regarding GI perforation. And the other thing about this page, besides not including the board's claim construction, is that it cites none of our, the patent owner's, evidence here. And we laid out at length in our papers and in our appeal brief how all of these points are disputed and controverted, how Dr. Nugget himself admitted that just because a cancer patient presents with nausea, you don't send them off for CT scanning to see if they have a GI perforation. Most cancer patients are nauseous. Most cancer patients have discomfort in the abdomen. That's where they have colorectal cancer. It's something else entirely to then take the next step of doing an investigation for GI perforation. This sentence that follows, where the board says, we are persuaded that an assessment necessarily begins with evaluating patients for symptoms, and in the event of a showing of such signs, that the physician would have assessed the patient for GI perforation. Again, the construction isn't here. It's unclear whether they're suggesting that the person of ordinary skill would have sent this patient off for imaging. But what's unclear about the board's statement here is, are they hypothesizing a patient who is presented with only nausea or only abdominal pain? In which case, I think the record evidence that they don't cite shows, in fact, doctors do not send such patients out for GI perforation assessment. But the claim language itself just uses the word assessing. So we're trying to get into an enormously granular level about what that means. It says assessing the patient. It doesn't deal with, it doesn't outline. It's something in the patent that describes what symptoms you have to show that leads you to take a test. I guess I understand what you're saying. I'm just not kind of clear on why that's relevant to anything here. Certainly, I think, as I mentioned, the patent concerns the clinical trials. It doesn't concern the standard of care for how you diagnose problems that your patients are having. And so, as Dr. Morse laid out, the ordinary meaning in this context of assessing for GI perforation is, you actually need to do diagnostic imaging. You need an X-ray that shows the free air in the abdomen, that shows that air is leaking from the perforated colon and into your abdomen. Or you need the CT scan that shows that, and that's a radiological inquiry. You can't know that just from asking the patient how they're feeling. But the board goes on, on page 20, to say, after the sentence you just read, it says, guiding that physician would have been the knowledge that GI cancers and systemic chemotherapy each were known to be causally related to GI perforation. The board does say that, and I'd like to wrap up briefly. And they cite a lot of transcript sites for that proposition. They cite a lot of the petitioner's evidence, none of the patent owner's evidence. Well, I mean, they're allowed to do that. They're the ones who get to weigh the evidence, not us. And they have to document to you that they have, in fact, weighed the evidence. They just did because they explained their conclusion and they cited the evidence in support. And they didn't say why they disagree with what we said. Well, that's opinion writing. We don't require them to go into that level of detail to establish their reasoning. We need their conclusion and what reasoning supports it. And I respectfully disagree, Your Honor. I think your Cutsforth decision, your Google decision, has set a threshold that Your Honors are expecting. Well, the threshold is the APA, and it may be applied differently in different cases. But the bottom foundation of the APA is the agency has to explain its conclusion and explain the reasoning supporting it. It doesn't have to specifically address each and every argument raised by the person it's rejecting. And it set forth its conclusion here. It set forth the evidence in support of it. That's enough. The fact that you might have wanted them to explain why you're wrong doesn't mean that they didn't satisfy the APA. I don't see what the point is here. And if I could wrap up with one final error. If you then flip to Appendix Page 21, the Board says, We note that secondary considerations have not been asserted in this case. That was simply incorrect. At Appendix Page 200, we laid out in our Patent Owner response the objective indicia of non-obviousness here that I think undermines and obliterates many of the findings that they made. The issue here is that oncologists never seen GI perforation before in the context of treating these sorts of patients. When Genentech went to the National Cancer Institute and explained, We have a problem in our Phase III clinical trials. Our drug, which would go on to establish a new standard of care for the treatment of cancer, our drug does seem to have this problem. And the National Cancer Institute's reaction was to immediately disseminate a letter to all of the oncologists participating in the many clinical trials using this drug to warn them about, and I'll quote the National Cancer Institute, an unexpected side effect. And I think that objective contemporaneous, not a dispute of the experts in 2017 and 2018, but a statement from the government in 2003 that this is unexpected is critical evidence that has to be evaluated. And here the Board said it didn't exist. Well, I actually, this takes some time to go through the details of this, but we went through it. I mean, one, I do think that the Board, and I can't quite put my hands on it now, but Dr. Nugget did talk about this evidence. I think the reason that the Board may have said that, nonetheless having dealt with the evidence you're talking about, is because your only citation is under a heading that doesn't say anything about secondary considerations. It talks about some chemotherapy patients experienced GI perforations, does not render the invention obvious. And that's page 198 and so forth. And then at the very end of that, so you're talking about all this evidence, and at the very end you have one paragraph, the only one I could find, page 200, that talks about objective indicia at all. And that paragraph is a few citations and one sentence. And CI's response to the discovery, blah, blah, blah, and the changes to clinical trials provide unbiased contemporaneous evidence of non-obviousness. That's it. So I think the Board treated this evidence in another context, which is essentially the way you treated it. So that's my understanding of why the Board would have said that, made that stark statement in this case. Why do you think I'm wrong? I don't know how I could have been more explicit. Am I right that this paragraph on 200 is the only place where you mention in this whole thing you actually cite to calling this objective indicia? Well, we get a single brief before the Patent Office, our Patent Owner Response, and this is it at Appendix 200, if you're correct. That's the pin site where we say, the effect of the inventor's discovery on the trial serves as objective indicia of the non-obviousness of the claimed methods. Then we cite multiple cases and we discuss this evidence. I suppose next time I could use a section heading, but I think we certainly presented this argument, and I know I talked about it at length at the hearing as well. And I think this statement by the Board that they apparently didn't understand that this is objective indicia of non-obviousness and they rejected it, and they really need to take this into account on remand. Well, my point is that I'm not sure they didn't take the evidence into account and they acknowledged your argument that a person skilled in the art would not have expected the rate of perforations to be as high as it was, and so they dealt with it kind of under a different heading and using different words. That's the way I read their opinion. No, we're not talking about anything about commercial success, long-field, and industry praise, none of that stuff, right? That's correct, Your Honor. Okay. Well, we'll reserve some for the other side. Thank you. Thank you. May I proceed? May it please the Court, Thomas Maloro for Hospira. The Board's decision was amply supported by the evidence in this case, and, in fact, the obviousness analysis not only involved the discussion of the parties' respective evidence and arguments, but then included an analysis on obviousness that's cited to both parties' evidence. I think counsel mentioned that. And what do you make of the sentence about secondary considerations? The sentence about secondary considerations is exactly the case in the sense that there was no cognizable secondary considerations that were put forward. There was one paragraph, I think the Court pointed to it, at A200 in the Patenone response, but there was absolutely no allegation that there was a nexus between the supposed unexpected result and the novel feature of the claim, which is the assessing limitation of the claim. And, in fact, the evidence that was cited there was this NCI cancer letter, and that letter was, in fact, referenced by the panel at the final hearing. I was asked a question about it at the final hearing, so the Board was well aware of that. And, interestingly, both in that letter, at Appendix 2039, there were no changes made to the assessments to be done to the patients. There was no change in the care to the patients. There were no changes made to the treatment of the patients or enrollment of the patients. There was simply an identification that this had been seen. And Dr. Morse, the expert for Genentech, confirmed that his practice of assessing patients for GI perforation has been the same throughout his career, and that was at Appendix 1157 to 58. Dr. Nugget confirmed the same. And, in fact, the Avastin label doesn't require any assessing for GI perforation, and Dr. Morse confirmed that at Appendix 1154. So what we have was an observation of an inherent property of the drug, and, in fact, an obvious property of the drug, for which no change was made. And, therefore, this is not cognizable evidence of an unexpected result of practicing the claimed invention, which includes the assessing limitation. And, in fact, there's no evidence that assessing was ever done any differently before or after the observation was made. So the board was absolutely correct in treating this issue with all the attention that Genentech gave it, quite frankly, which was virtually none. It was a throwaway sentence or paragraph in their papers, which the panel was well aware of, and cannot give rise to secondary considerations that would in any way overcome the obviousness. In terms of the evidence on obviousness, the panel cited not only Dr. Nugget, but, for example, when it determined that GI cancers and systemic chemotherapy were each known to be causally related to GI perforation, they cited two of Genentech's experts on that. One was Dr. Levy at Appendix 1386, where she was the radiologist, and she had testified that she had seen GI perforations that she concluded were caused by or associated with the tumors in cancer patients. Likewise, Dr. Morse at Appendix 1183, who was Genentech's oncologist, admitted that data showed that GI perforation was, in fact, associated with chemotherapy. And there was independent literature, more than just Dr. Nugget's testimony on that point. The Kennedy and Spence reference at Appendix 529 cited both chemotherapy and tumors as being associated with GI perforation. Combining that with the seriousness of GI perforation, Kennedy and Spence reported at Appendix 531 a 40 percent death rate. One skilled in the art, the physician, would have been motivated to do the assessment for GI perforation. Beyond that, there was evidence that VEGF is a growth factor that helps to promote repair of GI injury, and Bevacizumab is a so-called anti-VEGF antibody. And there was a reference to a paper from Matsui, which indicated that the anti-VEGF antibodies could impede the repair of the GI wall. So one skilled in the art, even in addition to the information about tumors and chemotherapy being associated with GI perforation, would have understood that the anti-VEGF antibody could also be playing a dangerous role. I think I have cut into the government's time if there are other questions. Well, you haven't, but that's okay. Oh, I'm sorry. We've been running you at the clock at ten minutes and leaving the government at five. Let me just ask you a housekeeping question, which is, so there's, I think in the statement of related cases, is there a pending district court case that's been stayed because of this? No, there is a pending. Or is it just peripheral district court litigation? There is a pending district court litigation, but the district court case has not been stayed. It's ongoing. I think there are other district court cases not involving our company, and none of them have been stayed, to my knowledge. And so you have one case that's ongoing? We do. And what stage is that? It's at a relatively early stage in terms of discovery. There's been no trial schedule set yet. All right. Thank you. Thank you. You're back. I'm back, Your Honor. Good morning. Corrine Dixon for the government. We've intervened on the constitutional issues. Let me ask you, is there anything peculiar? Some of these have a wrinkle to them, like the one we talked about the other day, where the application had issued after the AAI. Certainly. Is there anything different about this patent in terms of timing and so forth? Not that I'm aware of, Your Honor. So this is clearly a retroactive? I think so, Your Honor. And, of course, I'm happy to address any questions that Your Honors have. The parties haven't raised any issues today, and we've intervened in a lot of these cases, and Your Honors have been on a lot of these cases, so I won't waste any more of your time. I don't want to waste too much time, but can I ask you a little bit about Horne? I think either you or one of your colleagues and I had a colloquy about that a couple months ago. I believe that was my colleague, Your Honor, yes. I still don't understand why Horne would support the argument they're making, which is that retroactive application is unconstitutional per se, because Horne dealt with a specific administrative scheme that displaced the Court of Federal Claims jurisdiction. I think it specifically noted something to that effect. But Horne also was just saying, look, when we're fining you, we're not going to make you pay the fine, which is in lieu of the property, the raisins, and then go to the Court of Federal Claims to get it. That doesn't make any sense. But it's still all about getting just compensation for taking physical property, not rendering the statute per se unconstitutional. Isn't that the better reading of Horne? I would agree with Your Honor in terms of the merits of Horne. We're certainly different in the posture here. But isn't that why they, even if they had a valid takings claim here, the PTO didn't fine them or do anything that made them pay over money? I mean, because I don't think they're talking about the examination fees. They just want the statute declared unconstitutional. Isn't the remedy if they think their patent has been taken in the Court of Federal Claims? I don't want to speak necessarily to jurisdiction as opposed to whether it's in the Court of Federal Claims. I know your colleague didn't last time, but doesn't that make sense to you? We haven't briefed that, Your Honor, and so I hesitate to do that. I know, but you clearly have thought about it because I asked about it two months ago, or at least you should have. I think that, I mean, thinking through Your Honor's question, I think it's— It's just a very odd takings claim to me, that I don't see takings claims outside of Horne, which makes sense because the government actually imposed a fine, which is a proxy for the taking of the raisins, and also had a specific administrative scheme up there, that every other takings claim, when the government takes your property, they're allowed to do it. They just have to pay compensation, right? Well, I agree with Your Honor in the sense that this is not the average takings claim. I mean, to think through Your Honor's question maybe in another way— Are you aware of any case where—and I don't think Horne is the case— where the Supreme Court, or really any circuit court, has said a statute is unconstitutional because it takes property. Isn't the government allowed to take property under the Fifth Amendment? It just has to pay just compensation. Yes, Your Honor, I would agree. I think, thinking through your question, the reason why we think there's no takings clause claim here, obviously, is because, one, there's no valid property interest after this court has agreed with the board, and that's only when the patent will be canceled. But also, and to think through Your Honor's question, even to the extent that you were saying, okay, now someone has to pay just compensation, after the patent has been canceled, the compensation owed would generally be zero. And so it's difficult to think of a takings clause claim in this context. So I would agree with Your Honor that I don't think that they've cited any case, and I'm not aware of any case that looks like this in the takings clause context. Thank you very much. Thank you. To respond briefly to the points that my colleagues have made, the APA does require that the board actually give parties the opportunity to be heard and provide a reasoned decision. And here, the board certainly credited petitioner's evidence, but it said nothing about our evidence. So when you're making that argument, you're making it about the final decision, not because you make another argument about the fact that they did a claim construction that was new and different. Yeah, I'm talking about the obviousness analysis, yes, Your Honor. And I want to emphasize something that this court said in the Google versus Intellectual Ventures case, when the board sent one of these final written decisions back for remand. And the court was critical in multiple places. It said, the board did not acknowledge any of Google's evidence, let alone explain why it considered such evidence unconvincing. In another spot, the board, the Federal Circuit emphasized that stating a disagreement with Google, however, does not amount to a satisfactory explanation of the findings. Here we heard from Hospira about all these reasons that it thinks it would have been obvious for a clinician in 2003 who's giving Bevacizumab to a patient to subsequently assess that patient for GI perforation. We vigorously disputed that. And I think the objective indicia we submitted goes directly to that battle of the experts. When the National Cancer Institute said, this is unexpected. What the board found, what the board explained is, oh, it would have been obvious to check for this because of these known associations. That's not what the National Cancer Institute thought. The National Cancer Institute thought this was unexpected. And so perhaps on remand we'll lose again. But what we're entitled to under the APA is an explanation for why the board believes Hospira and not Genentech, and not just a recitation of the evidence that Hospira has marshaled with no explanation, in fact, a denial of the fact that we've presented any evidence whatsoever. Thank you, Your Honors. Thank you. We thank both sides. And the case is submitted. That concludes our procedure.